UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jose L. Linares |
| | : | |
| v. | : | Criminal No. 14-458-JLL |
| | : | |
| ANTHONY BLUMBERG and | : | |
| MICHAEL CRAIG MARSHALL | : | |
| | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT MARSHALL'S MOTION FOR REVIEW AND MODIFICATION OF CONDITIONS OF RELEASE**

The Court should deny defendant Michael Craig Marshall's third motion to permit him to travel to and reside in Bermuda, (DE # 49) just as Magistrate Judge Hammer denied his first two. The defendant is a dual Bermudian and United Kingdom citizen, with no ties whatsoever to the District of New Jersey, scant ties elsewhere in the United States, and strong ties to his home country. If permitted to reside in Bermuda pending trial, the defendant poses a serious risk of flight because he faces a substantial prison sentence if convicted, and the government would not be able to secure his appearance from Bermuda if he refused to return except through extradition proceedings. Further, no branch of the U.S. government—including the Court, pretrial services, the Department of Justice, and law enforcement—can compel the defendant to do <u>anything</u> once he is on Bermudian soil, including surrender his passport, comply with the conditions of his pretrial release, or appear in court. Even if the defendant were to surrender his Bermudian passport, moreover, the U.S. government (as opposed to the Bermudian government) cannot prevent him from acquiring a replacement and absconding to another country, including one that does not

have an extradition treaty with the United States.  As such, permitting the defendant to travel to and reside in Bermuda during the pendency of these proceedings will not reasonably assure his appearance and his request should be denied.

## Background

On Thursday, May 22, 2014, the defendant, a dual Bermudian and United Kingdom citizen, flew from his home in Bermuda to JFK Airport in New York, NY. He was scheduled to fly back to Bermuda at 5:20 p.m. on Tuesday, May 27, 2014.  On the morning of May 27, 2014, law enforcement agents appeared at an address in New York, NY, at which the defendant had indicated on his entry form he would be staying, but they did not find him there.  Instead, they found members of the defendant's family, including his wife, who told agents the defendant was staying elsewhere in New York City, but who would not tell the agents the defendant's precise location.

Shortly thereafter, counsel for the government contacted the defendant's attorney, told him the government was planning to file a complaint against the defendant, and asked whether the defendant would voluntarily surrender. Counsel for the government subsequently informed the defendant's attorney that, if the defendant agreed to surrender voluntarily and his attorney secured his passport a reasonable time prior to his flight's 5:20 p.m. departure time, the government would not seek to arrest him.  Knowing that agents were actively seeking him and that he would be unlikely to be able to flee from the country, the

defendant surrendered his passport to his attorney and the government did not arrest him.[1]

That same day, the government filed a complaint charging the defendant with one count of conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States Code, Section 1349. On June 4, 2014, the defendant made his initial appearance and Judge Hammer released the defendant on a $200,000 appearance bond and issued its Order Setting Conditions of Release. (DE #9). Those conditions included co-signers and collateral for the bond, and restricted defendant's travel to New Jersey and New York. (Id. at 2.)

On August 7, 2014, a grand jury sitting in the District of New Jersey returned an indictment that charges the defendant with one count of conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States Code, Section 1349, and with one count of wire fraud, in violation of Title 18,

---

[1] The defendant incorrectly contends that he stayed in the United States even though "the Government had not yet obtained the legal right to arrest him." (Mot. at 1.) The case agents investigating the crimes the defendant and his co-conspirator have committed come from the Federal Bureau of Investigation ("FBI") and the United States Postal Inspection Service ("USPIS"). They had the legal right to arrest the defendant in a public place once there was probable cause to believe he had committed a crime, even in the absence of an arrest warrant. See 18 U.S.C. § 3052 (authorizing FBI agents to "make arrests without warrant . . . for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."); 18 U.S.C. § 3061(a)(3) (identical authorization for USPIS Postal Inspectors); United States v. Watson, 423 U.S. 411, 423-24 (1976) (holding that warrantless probable cause arrests are constitutional); United States v. Shabazz, 533 Fed. Appx. 158, 162 (3d Cir. 2013) ("An arrest without a warrant is lawful if there is probable cause.") (citing Watson). Such probable cause existed well in advance of the defendant's surrender.

United States Code, Section 1343.  The conspiracy and wire fraud charges each carry a maximum penalty of thirty (30) years imprisonment because the violations affected a financial institution.[2]

The previous year, in December 2013, two of the defendant's co-conspirators, Jonathan Daspin and Thomas Lekargeren, had pleaded guilty—Daspin to one count of conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States Code, Section 1349, and Lekargeren to one count of conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States Code, Section 371.  Under their plea agreements, Daspin stipulated to a final offense level of 31, which yields a range of 108 – 135 months imprisonment, while Lekargeren stipulated to a final offense level of 27, which yields a range of 70 – 87 months imprisonment.  The defendant is facing similar guidelines ranges if convicted.

On September 9, 2014, the defendant moved to modify the conditions of his release so that he could be permitted to travel to and reside in Bermuda during the pendency of these proceedings.[3]  The government opposed that motion by letter dated September 12, 2014.  At a hearing on September 15, 2014, Judge Hammer denied that motion, but did permit the defendant a short trip home to put his affairs in order. (DE #19, DE #21, DE #25 at 25.)  The

---

[2] The indictment also charges co-defendant Anthony Blumberg with conspiracy to commit wire and securities fraud, six counts of wire fraud, and one count of securities fraud.
[3] That motion, made by a letter from the defendant to the Court, has not been docketed, but is attached to the defendant's current motion as Exhibit A.

defendant traveled to Bermuda for ten (10) days and returned to the United States.

The defendant filed a second motion to modify the conditions of his release by letter dated November 4, 2014, again asking for permission to travel to, and reside in, Bermuda pending trial. (DE #32.)   The government again opposed that request, (DE #41), and, again, Judge Hammer denied it. (DE #43 at 16.)

If the defendant were allowed to travel to Bermuda and refused to travel back, the government could secure his appearance only through extradition proceedings.   Although the defendant has represented that he will provide advance written assurance that he will not contest extradition, the government has been advised by its Office of International Affairs that such agreements are unenforceable in Bermudian extradition proceedings.   Because Bermuda is a first-party affidavit country, moreover, the government would have to present evidence of the defendant's guilt through witness affidavits, and would be forced to conduct a mini-trial in order to secure the defendant's attendance should he refuse to return from Bermuda.   Further, if the Court permitted the defendant to return to Bermuda and the government then had to seek his extradition, Bermudian authorities may decide that the problem is one the U.S. government (as a whole, including the judicial branch) itself made, which may complicate U.S. efforts to seek his extradition.

Further, the State Department has advised the government of two important facts.   First, once the defendant is on Bermudian soil, each and every

official of the U.S. government—whether from the judicial, executive, or legislative branch—is powerless to compel the defendant to do anything, including surrendering his passport, complying with the conditions of his pretrial release, and appearing before the Court. Thus, as soon as the defendant deplanes in Bermuda, the government is powerless to require him to surrender his passport.[4]

Second, even if the defendant were to surrender his Bermudian passport, the U.S. government cannot compel him not to apply for a replacement. Bermuda's Chief Immigration Officer has confirmed to the Department of Justice's Office of International Affairs that it can enter an alert in its system that should prevent the defendant from being issued a new passport if it receives formal notice from the U.S. consulate in Bermuda advising that the defendant has surrendered his passport and advising the date on which the passport will be returned to him. The Bermuda immigration authority's decision to place that alert in its system, however, is wholly discretionary as a matter of comity, and not something that would be mandated by an order from a Bermudian court.

---

[4] The defendant's proposal of surrendering his passport to the U.S. Consulate in Bermuda raises related but separate problems. Retaining personal property is outside the scope of a consular officer's authority. See 21 C.F.R. § 71.5 ("Except in a public emergency, no officer of the Foreign Service shall accept private property for storage or safekeeping in the office or for transmission to some other destination, unless it is property belonging to the estate of a deceased American citizen, or property over which the officer has jurisdiction as a result of a catastrophe at sea."). Further, the defendant's passport is an official document of the United Kingdom and Bermudian governments. A U.S. court order that a consular officer confiscate the passport thus risks ordering the officer to violate local law, with which he is bound to comply, and may be in tension with applicable treaty law.

And, of course, the Court's order would be unenforceable in Bermuda, just as a foreign court's order is here.

To bolster his argument for being permitted to reside beyond the reach of the U.S. government pending trial, the defendant has made inaccurate representations regarding discovery in this matter. While it is true that the government first produced discovery in this matter on November 7, 2014, that was wholly a result of the intransigence of the defendant and his co-defendant, Anthony Blumberg. On August 27, 2014, prior even to the defendants' arraignment, the government proposed the sort of protective order governing discovery materials that is routine in document intensive criminal prosecutions, and which the Court eventually entered. (DE #37.) The defendants not only declined to consent to the order, but also would not agree to an interim protective order that would govern the discovery until the Court could rule on the government's request for entry of the protective order. As such, the government was not able to produce discovery to the defendants until after the Court's ruling. (DE #35.)

The defendant also wrongly claims that the discovery the government has provided is disorganized and that the government has "refused to provide any form of index to enable" the defendant to review the discovery. (Mot. at 12.) As the government has repeatedly explained to the defendant's counsel, the discovery material is, in fact, highly organized. The government has provided all of the material in a form that allows it to be loaded into a database. In that

database, the materials are fully sortable by a variety of fields, including date, sender, recipient, and subject.  In addition, the government has also produced robust, fully searchable metadata, which operates as an index to the discovery materials, and which permits the defendants to search for any Bates number, person, subject, date, or key word that they think may be included in documents relevant to the preparation of their defense.

    The government has not stopped there.  To help the defendants master the discovery material efficiently, the government has also provided them:

- binders of key documents relevant to the charged conduct, which permit the defendants to quickly review many of the documents most germane to the case, all collected neatly in one place and requiring no searching or other effort on their part;
- a large collection of FBI-302's and Postal Inspection Memoranda of Interviews ("MOI"s), which represent the fruits of the government's investigative efforts and which identify, by Bates number, the documents the government showed to each witness, thereby providing the defendants a roadmap of the documents the government has identified as relevant to the issues and possible defenses in this matter, including on topics that the defendants have identified as potentially exculpatory;
- cover letters accompanying productions from ConvergEx Group and its affiliates (which productions account for the vast majority of the

-8-

    government's discovery production to date), which often explain the contents of those productions.  At the defendants' request, the government is also producing cover letters accompanying productions it has received from other third parties; and

- consistent with the Court's November 5, 2014, Order (DE #35), the government has identified by Bates numbers specific documents relevant to topics the defendants have identified as potentially exculpatory.

    The defendant's counsel fully understands that the material the government has provided is, in fact, highly organized, and that the tools the government has provided to the defendants to navigate that material are substantially more than defendants typically receive (and vastly more than any rule, law, case, or constitutional provision requires), or indeed, more than most parties to document intensive civil cases receive.

## **Argument**

    The defendant's third motion for permission to reside in Bermuda pending trial should be denied.  Judge Hammer, as directed by the Bail Reform Act, has twice correctly determined that permitting the defendant to live beyond the effective reach of the Court, pretrial services, and the rest of the U.S. government does not "reasonably assure the appearance" of the defendant at future proceedings in this matter.  18 U.S.C. § 3142(c)(1)(B).  In denying the defendant's first request, Judge Hammer rightly dubbed the travel restriction a

"critical component" of the "series of conditions put in place to manage that risk" as to this defendant, and rightly concluded that removing that "critical component" "crosses the line from acceptable risk to an unacceptable risk in terms of assuring the defendant's appearance at trial." (DE #25 at 20.) Similarly, in denying the defendant's second request, Judge Hammer rightly found that, if he permitted the defendant to reside in Bermuda, "the risk of flight is simply too great." (DE #43 at 17.)

While the Court must review Judge Hammer's decision de novo, United States v. Delker, 757 F.2d 1390, 1395 (3d Cir. 1985) (affirming order of pretrial detention), the Court is empowered to "consider carefully the decision and reasoning of the magistrate." Id. None of the defendant's arguments to this Court undermine the wisdom of Judge Hammer's previous decisions and the Court should similarly deny the defendant's request.

Permitting the defendant to reside in Bermuda pending trial presents many problems. First, and most fundamentally, it places the defendant beyond the effective reach of any component of the United States government. In Bermuda, obviously, the United States is not sovereign, and has no authority to compel the defendant to do anything, nor to undertake law enforcement or court administrative actions of any kind. Indeed, as Judge Hammer has noted, Bermuda has neither pretrial services nor any of the "means of its standard safeguards that Mr. Marshall is complying [with] the terms of his release." (DE #25 at 19.) Once in Bermuda, should the defendant choose not to surrender his

passport, not to comply with the conditions of his release, or not to return to this district, the United States would be, itself, powerless to compel him to do any of those things.

If the defendant refused to return to the United States, the government could secure his appearance only through extradition proceedings. Agreements to waive extradition proceedings are unenforceable, and the government would have to present evidence of the defendant's guilt through first-party witness affidavits, a time-consuming and labor intensive process. Bermudian authorities, moreover, may decide that the problem is one the U.S. government (as a whole, including the judicial branch) itself made, which may complicate U.S. efforts to seek his extradition.

Further, the government has no means of requiring the defendant to surrender his passport once he were to arrive in Bermuda. Given the legal difficulties that preclude the U.S. consular officer in Bermuda from taking custody of the defendant's passport, see supra at fn. 4, the defendant would likely have to send his passport back to pretrial services in the District of New Jersey, which currently holds his passport. Should he choose not to do that, however, the government is powerless to require him to surrender his passport.

Finally, even if the defendant were to surrender his Bermudian passport, the U.S. government cannot compel him not to apply for a replacement. Bermuda's Chief Immigration Officer has confirmed to the Department of Justice's Office of International Affairs that it can enter an alert in its system that

-11-

should prevent the defendant from being issued a new passport. To do that, it must receive formal notice from the U.S. consulate in Bermuda that the defendant has surrendered his passport and notifying the Bermudian officials of the date on which the passport will be returned to him.

The Bermuda immigration authority's decision to place that alert in its system, however, is wholly discretionary as a matter of comity, and not something that would be mandated by an order from a Bermudian court. And, of course, the Court's order would be unenforceable in Bermuda, just as a foreign court's order is here. Should the Bermudian officials decide to exercise their discretion in a different manner, or simply not apply the flag in their system through neglect or deliberate choice, no branch of the United States government would have any recourse. Neither the Court nor the Department of Justice, then, can prevent the defendant from obtaining a new passport should he choose to surrender his current one.

The defendant's conduct in this matter to date does not alter the correctness of Judge Hammer's conclusion that permitting him to reside in Bermuda pending trial creates an unacceptable risk of flight. The defendant did, as noted above, return home for a few days to put his affairs in order and did return from that trip. But as Judge Hammer rightly noted, having a window of return of a few days is "qualitatively different than having a much broader window of return." (DE #25 at 21.) The defendant did not then have time to formulate, much less execute, a plan to obtain a replacement passport and travel

beyond Bermuda; given more time, however, he may well.  Further, returning home now and residing there until trial would allow the defendant to settle into his old life, far from this country, where he faces charges carrying the prospect of a prison term of many years should he be convicted.  Counterbalanced against that would only be the loss of his wife's relatively modest New York apartment by which he has secured his bond.[5]  He has no other ties to this community, or indeed to this country, to anchor him here or counterbalance his substantial incentive to flee.

The cases the defendant cites in which other courts have permitted defendants to travel or reside abroad pending trial are either inapposite or undercut his request.  In United States v Hansen, 108 Fed. Appx. 331 (6th Cir. 2004), for example, the foreign national defendant was charged with bulk cash smuggling $100,000 of his own, apparently lawful, money.  See United States v. Hansen, No. 2:04-cr-00091-GLF at DE #75 (S.D. Ohio December 13, 2004).  As such, he faced a statutory maximum penalty of five (5) years and a likely guideline range of 0-6 months, which would fall within Zone A of the Sentencing Table.  See 31 U.S.C. § 5332(b)(1), U.S.S.G. §§2S1.3(b)(3), 5A.  The defendant here, in contrast, faces a substantial period of incarceration if convicted.

---

[5] The defendant claims that his mother-in-law would become homeless if he were to flee because his wife would lose the apartment in which his mother-in-law currently resides.  Nothing, of course, prevents the defendant and his wife from make new living arrangements for his mother-in-law.

In United States v. Lee Wares, No. 09-00335-cr-Leon (D.D.C.),[6] the court permitted a number of foreign defendants to travel and reside abroad pending trial.  The court there did so, in part, because it had ordered the twenty-two (22) defendants in that case to be tried in four separate trials.  Given the number of defendants and the concomitantly lengthy period of pretrial motion practice, some of the defendants in the latter trial groups could have been waiting in the U.S. for years before proceeding to trial.

In United States v. Marciano, 04-cr-667-LDW (E.D.N.Y.), the defendant was not permitted to travel abroad until he agreed to a $4,000,000 bond, which was secured by multiple co-signers (who were family members residing in the United States), as well as by property and cash worth approximately $850,000. That is substantially more collateral than the defendant here has posted or offered to post.

Finally, in United States v. Aggarwal, No. 13-cr-00884 the defendant was permitted to take two trips to his home country, India, but not reside there, see id. at DE #19 and #24, which is a benefit the defendant here has already been afforded.  The Aggarwal defendant was permitted to take the first trip only after increasing his bond from $500,000 to $1,000,000, and having it secured by $250,000 in cash or property and co-signed by three financially responsible persons. Id. at DE #19.  He was permitted to take the second trip only after

---

[6] In his string citation, the defendant cites both United States v. Lee Wares, No. 09-00335-Cr-Leon (D.D.C. May 7, 2010, June 7, 2010, November 15, 2011, and January 25, 2012) and United States v. Patel, No. 09-cr-335-RJL, D.I. 458, Order (D.D.C. Aug. 29, 2011).  Those are citations to the same case and are discussed only once here.

increasing the secured portion of his bond to $750,000.  Id. at DE #24.  Most importantly, the defendant in Aggarwal, unlike the defendant here, was permitted the opportunity to take those trips only after he had pleaded guilty and agreed to cooperate with ongoing government investigations. He thus, unlike the defendant in this case, had every reason to comply with the conditions of his release to obtain the maximum possible benefit for his cooperation.

As the risk of trial and conviction becomes more imminent, and the comforts of home more ingrained, the defendant may well decide that staying put in Bermuda or heading elsewhere, beyond the government's ability to retrieve him, is far preferable to standing trial for the crimes he has committed.  For these reasons, the defendant's request to modify his conditions of bond to permit him to travel to and reside in Bermuda should be denied.

William J. Stellmach
Acting Chief
Fraud Section, Criminal Division
Department of Justice

By: _____/s/_____
Justin Goodyear
Jason Linder
Patrick Pericak
Trial Attorneys
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

Paul J. Fishman
United States Attorney
District of New Jersey

By: _____/s/_____
Leslie F. Schwartz
Assistant United States Attorney
United States Attorney's Office
970 Broad Street
Newark, NJ 07102