<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>ANTHONY BLUMBERG and MICHAEL CRAIG MARSHALL,<br><br>        Defendants. | Crim. No. 14-458 (JLL)<br><br><br>**OPINION** |

Defendants Blumberg and Marshall are both charged with conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. §1349, along with substantive counts of wire fraud, in violation of 18 U.S.C. §1343. Defendant Blumberg is also charged with one count of securities fraud, in violation of 18 U.S.C. §1348. On November 10, 2014, Defendants jointly filed a motion to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). The Court held oral argument in connection with Defendants' motion on January 13, 2015. The Court has carefully considered the arguments submitted in support of and in opposition to the instant motion, as well as the arguments presented at the January 13th hearing. For the reasons set forth below, the Court denies Defendants' motion to dismiss the Indictment.

**I.    Background**

Count I (conspiracy to commit securities fraud and wire fraud) arises from the Defendants' alleged practice of charging clients a "spread" on trades executed on the clients' behalf without disclosing the additional charge to those clients. According to the indictment:

1

> The object of the conspiracy was for defendants . . . to hide from clients CGM Limited's practice of taking spread income by, among other things, deceiving, misleading, and making materially false statements to such clients when they requested information that could lead to the discovery that spread was being taken, in order to earn substantial spread income from those clients.

(*Id*. at ¶3).

By way of background, the Indictment alleges that ConvergEx Group, LLC was a company that owned several operating subsidiaries, including broker-dealers and related companies, offering brokerage services to U.S. and foreign institutional clients. (*Id.*, ¶1(a)).

Defendant Anthony Blumberg was the Chief Executive Officer of ConvergEx Global Markets Limited ("CGM Limited"), a wholly owned subsidiary of ConvergEx Group that was registered as a broker-dealer in Bermuda. (*Id.*, ¶1(b), (h)). Defendant Michael Craig Marshall was a trader at CGM Limited and its predecessor entities, and, from about January 2008 through December 2011, he served as Senior Vice President of CGM Limited. (*Id*., ¶1(i)).

G-Trade Services, LLC ("G-Trade") was a U.S. broker-dealer based in New York, and a wholly owned subsidiary of the ConvergEx Group. (*Id.,* ¶1(c)). ConvergEx Ltd. was a U.K. broker-dealer based in London, and a wholly owned subsidiary of ConvergEx Group. (*Id*., ¶1 (d)). ConvergEx Asia Pacific Limited ("CAPL") was a Hong Kong broker-dealer and a wholly owned subsidiary of ConvergEx Group. (*Id*., ¶1(e)).

The Indictment alleges that G-Trade, ConvergEx Ltd., CGM Limited and CAPL (and in certain instances, their predecessor entities) offered global portfolio and block trading services to clients through CovergEx Global Markets Division (CGM Division), which was formerly known as G-Port. (*Id*., ¶1(f)). CGM Division sales traders from G-Trade, ConvergEx Ltd., and CAPL (collectively, "Client-Facing Brokers") received orders to buy and/or sell securities from clients.

(*Id*. at ¶1(l)). Once the orders were received, the CGM Division sales traders routed these orders to CGM Limited. (*Id*. at ¶1(m)). Then, traders at CGM Limited, including Marshall, rerouted these orders to "local brokers," who traded in the market where the chosen security was located, for execution. (*Id*. at ¶1(n)-(p)). Once the local broker executed a trade, that local broker gave the CGM Limited trader the details of the trade, including the time, price, and number of shares for each security bought and sold. (*Id*. at ¶1(o)).

CGM Limited traders would then add a "spread" to the prices obtained from the local brokers. (*Id*. at ¶1(q)). The spread consisted of either a mark-up (an additional amount paid for the purchase of a security) or a mark-down (a reduction of the amount received for the sale of the security), which the subsidiaries kept as profit. (*Id*.). The traders recorded the price, inclusive of any mark-up or mark-down in G-Pro in a column labeled as "Client Price." (*Id*.). Employees of ConvergEx Group, G-Trade, ConvergEx Ltd., CGM Limited, CAPL and CES referred to mark-ups and mark-downs as "spread," "trading profits," or "TP." (*Id*.).

After the CGM Limited traders completed a client's order, the Client-Facing Broker that received that order provided a trade confirmation ("confirm") to the client. (*Id*. at ¶1(r)). Though the confirm separately listed the commission charged by the Client-Facing Broker and the price per share (which included the spread taken by CGM Limited), it did not separately identify the amount that was marked up or down. (*Id*. at ¶1(s)).

The confirms, however, included a disclosure which stated: "orders might be directed to affiliates for execution and that such affiliates might act as principal and in that connection earn a mark-up, mark-down, or spread." (*Id*.). In addition, beginning by at least in or about 2004, employees of CGM Division provided clients with a document titled "Client Brokerage Terms and Conditions." One of the provisions of this document stated:

3

> [U]nless otherwise agreed in writing, Client authorizes ConvergEx, in its sole discretion and without notice, to use the services of one or more other persons or entities (including its affiliates) in connection with the execution, clearance and/or settlement of any Order and/or Transaction, or otherwise to service Client or perform its obligations, and that such persons or entities may act as principal and earn a spread and may receive payment for order flow or other remuneration and share it with CovergEx.

(*Id*. at ¶1(t), (u)).

The Indictment further alleges that, from at least in or about 1997 through at least in or about August 2011, the Defendants Blumberg and Marshall, along with certain co-conspirators, made "affirmative misrepresentations to hide from clients the fact that spread was being or had been taken" when such clients requested information that could leave to the discovery that spread was being taken. (*Id*. at ¶¶ 3, 4). It is alleged that Defendants Blumberg and Marshall knowingly and intentionally transmitted such affirmative misrepresentations by means of wire communications in interstate and foreign commerce. (*Id*., ¶10).

For example, the Indictment alleges that, in certain instances, when a client requested a "time and sales report" for a trade that had included spread, defendants and co-conspirators would use data from other trades on the exchange (not the client's trade) to create false reports that reflected the same total price that appeared on the confirms sent to that client. (*Id*. at ¶5). This false document would allegedly hide the fact that a spread had been taken. (*Id*.)

It is also alleged that Defendants and co-conspirators "willfully violate[d] instructions" from clients to provide real-time time sales reports (also known as "real-time fill information") in order to hide the fact that spread was being included in the prices provided to them and would make false statements to the client when the client would inquire about why this real-time fill information was not being provided. (*Id*. at ¶6).

Based on these facts, the Indictment alleges that Defendants conspired to commit securities and wire fraud in violation of 18 U.S.C. §1349, committed wire fraud in violation of 18 U.S.C. §1343, and that Defendant Blumberg committed securities fraud in violation of 18 U.S.C. §1348.

## II. Legal Standard

An indictment is deemed "sufficient so long as it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (internal quotations omitted). "Moreover, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Id.*

In evaluating the sufficiency of an indictment, allegations in the indictment are assumed to be true, *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990), and a court is to use "a common sense construction" of the charges, *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir. 2000). "A ruling on a motion to dismiss is not, however, 'a permissible vehicle for addressing the sufficiency of the government's evidence.'" *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (citation omitted). As stated above, evidentiary questions, such as credibility determinations and the weighing of proof, should not be assessed at the motion to dismiss stage. *Id.*

### III. Discussion

Defendants move to dismiss the Indictment in its entirety on three grounds: (1) the facts alleged in the Indictment negate the existence of the alleged scheme, (2) the Indictment should be dismissed because the alleged victims of the scheme were not defrauded, and (3) the alleged false statements do not save the Government's otherwise defective Indictment from dismissal because they do not negate the client disclosures. (Def. Br. at i). At oral argument, Defendants also challenged the Indictment on the basis that it is a legal impossibility that Defendants could have been engaged in a scheme to defraud clients of ConvergEx since 1997 given that: (a) ConvergEx did not exist at that time, and (b) the first of the seven specific instances alleged in the Indictment did not occur until 2007. *See* Tr. (Jan. 13, 2015) at 19:12-20:21.

The Government opposes dismissal of the Indictment on the basis that: (a) the allegations related to the disclosure statements are consistent with and do not contradict the allegations related to the scheme to defraud because the specific false representations made by Defendants make any generic disclosure statements, at best, half-truths, and (b) clients were not defrauded by Defendants' failure to itemize the amount of spread included in the prices provided to clients, but rather by Defendants' affirmative misrepresentations to such clients when they requested information that could lead to the discovery that spread was being taken. (Gov. Opp'n Br. at 1-5). By way of example, the Government maintains that "telling a victim that a practice might occur, but then lying when the victim asks a question that might reveal that the practice is in fact occurring, with the purpose of hiding the practice, amounts to a scheme to defraud." (*Id.* at 11). Finally, the Government argues that even in the absence of an affirmative duty to disclose spread, the specific lies alleged in the Indictment are material and constitute fraudulent conduct because, absent the lies, the victims could have negotiated a better deal with the ConvergEx

6

client-facing broker, and the lies may have affected the price the clients paid for the securities transactions executed by CGM Limited. (*Id*. at 15).

The Court begins by reiterating that there are three counts alleged in the Indictment: conspiracy to commit wire and securities fraud (against both Defendants); wire fraud (against both Defendants); and securities fraud (as against Defendant Blumberg). To prove wire fraud, the Government must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012) (citations omitted). To prove securities fraud, the Government must establish: (1) fraudulent intent, (2) scheme or artifice to defraud, and (3) nexus with a security. *United States v. Motz*, 652 F.Supp.2d 284, 294 (E.D.N.Y. 2009); *see also United States v. Mahaffy,* 693 F.3d 113, 125 (2d Cir. 2012). Finally, a violation of 18 U.S.C. § 1349 requires generally: (1) two or more persons agreed to commit a crime; (2) the defendant knowingly and voluntarily joined in the conspiracy; and (3) a member of the conspiracy performed an overt act for the purpose of advancing the conspiracy. *See United States v. Reed*, 350 F. App'x 675 (3d Cir. 2009).

The crux of Defendants' first argument in support of dismissal of *all counts* of the Indictment is that all counts contain an element of a scheme to defraud and that the disclosure statements at issue negate the existence of such a scheme, thereby rendering all counts of the Indictment defective. (Def. Br. at 13).[1] "[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *United States v. Hanson,* 41 F.3d 580, 583 (10th Cir. 1994).

---

[1] Defendants do not otherwise challenge the sufficiency of any of the other elements of the offenses charged.

If the fraudulent scheme alleged in the Indictment were limited to Defendants' failure to disclose the practice of taking spread income, then the Court might be swayed by Defendants argument that the disclosures at issue—which disclosed that a spread "may" be taken—render such scheme implausible or defective. *See, e.g., Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed.") (citation omitted). But the Indictment does not limit the fraud to Defendants' failure to disclose the spread. Rather, the Indictment alleges that "the object of the conspiracy was for defendants . . . along with co-conspirators . . . to hide from clients of CGM Limited's practice of taking spread income by, among other things, . . . making materially false statements to such clients when they requested information that could lead to the discovery that spread was being taken, in order to earn substantial spread income from those clients." (Indictment, ¶ 3). In other words, the Indictment alleges that the scheme to defraud at issue was triggered by, among other things, the *false statements* made by Defendants in response to clients who requested information that could have led to the discovery that spread was, in fact, being taken. As such, the Court finds that the existence of the disclosure, without more, does not negate the particular fraudulent scheme alleged in the Indictment.

Moreover, the issue of whether or not Defendants had a fiduciary duty to disclose the spread is of no moment given that the Indictment alleges that Defendants affirmatively misrepresented the spread when customers asked for information that could lead to the discovery that spread was taken. *See, e.g., Kaplan v. United States*, 229 F. 389, 390 (2d Cir. 1916) ("The crucial question, however, is whether or not the defendant devised a scheme to defraud by using false statements of his financial condition to induce the sale to him on credit of a large quantity of goods which, had the truth been known, would not have been sold. Here, the controlling

consideration is the truth or falsity of the statements. If false and known by the defendant to be false, it is impossible to reconcile his conduct with honesty."). Because the Indictment alleges facts suggesting that Defendants engaged in a scheme of making false representations suggesting that no spread had been taken in order to induce the client into accepting the terms of a transaction that *included* the taking of spread, the Court finds that the Indictment alleges sufficient facts to support the existence of a scheme to defraud. *See generally Hanson,* 41 F.3d at 583 ("[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension."); *United States v. Cannistraro*, 800 F. Supp. 30, 81 (D.N.J. 1992) ("It is a well settled principle that once disclosures are made, there is a duty to disclose all material information regardless of a fiduciary duty owed to the shareholders."). Thus, to the extent Defendants' seek dismissal of all counts of the Indictment on the basis that all counts fail to allege a plausible scheme to defraud, such request is denied.

The Court turns now to the second argument raised by Defendants in support of dismissal of the Indictment—namely that it is a legal impossibility that Defendants could have been engaged in a scheme to defraud clients of ConvergEx since 1997 given that: (a) ConvergEx did not exist at that time, and (b) the first of the seven specific instances alleged in the Indictment did not occur until 2007. *See* Tr. (Jan. 13, 2015) at 19:12-20:21. As a preliminary matter, this argument was not raised in Defendants' moving brief; rather, it was raised for the first time during the January 13, 2015 oral argument. *See generally In re Grand Jury*, 635 F.3d 101, 105 (3d Cir. 2011) ("[B]ecause this contention was raised for the first time at oral argument, we will not consider it."). As such, neither side has come forward with legal authority in support of their respective positions. Putting such deficiencies aside, Defendants essentially ask the Court to strike those allegations of the Indictment for which there is no factual support. Such requests are

typically brought pursuant to Federal Rule of Criminal Procedure 7(d), which provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). "The authority of the court to strike such surplusage is to be limited to doing so on defendant's motion, in the light of the rule that the guaranty of indictment by a grand jury implies that an indictment may not be amended." Fed. R. Crim. P. 7 advisory committee's note; *see also United States v. Weston*, 526 F. App'x 196, 199 (3d Cir. 2013). "A motion to strike surplusage from an indictment is addressed to the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein are not relevant to the charge made or contain inflammatory or prejudicial matter." *United States v. Vastola,* 670 F. Supp. 1244, 1254 (D.N.J. 1987) (internal citations omitted); *see, e.g., United States v. Alsugair*, 256 F. Supp. 2d 306, 317-18 (D.N.J. 2003) (striking language from the indictment that suggested that defendant was "part of a larger scheme" because the indictment only made specific reference to two individuals who were part of the alleged conspiracy to defraud and reasoning that "[t]he indictment's multiple references to 'others' . . . implies that there are additional individuals who were involved in the scheme, which could prejudice the defendant by leading the jury to believe that there exists a broader scope of illegal activity than is actually charged in the indictment."). However, courts within this district have held that even in cases where the language in the indictment is not essential to the charges contained therein, "the language will not be stricken as surplusage in cases where the language is relevant in a general sense to the overall scheme alleged in the indictment." *United States v. Caruso*, 948 F. Supp. 382, 392 (D.N.J. 1996). In other words, "language may remain in an indictment in cases where the language is relevant to the evidence that the government will present at trial." *Id.*

Because Defendants did not move to strike the alleged surplusage from the Indictment pursuant to Federal Rule of Criminal Procedure 7(d), the Court declines to do so at this time. *See generally Weston*, 526 F. App'x at 199 (noting that district court did not have authority to *sua sponte* strike as surplusage a reference to an obliterated serial number on the gun in indictment charging defendant with being a felon in possession of a firearm in the absence of a motion to strike the alleged surplusage). Thus, to the extent Defendants ask the Court to dismiss (or strike) allegations in the Indictment that the scheme to defraud began in or around 1997—on the basis ConvergEx did not exist at that time and/or that the first of the seven specific instances alleged in the Indictment did not occur until 2007—such request is denied without prejudice to their ability to file a separate application pursuant to Federal Rule of Criminal Procedure 7(d).

## IV.   Conclusion

For the reasons discussed above, the Court finds that the Indictment sufficiently states the offenses charged against Defendants. In particular, the Indictment contains the elements of the charged offenses (including but not limited to a plausible scheme to defraud), sufficiently apprises Defendants of what they must be prepared to meet, and provides Defendants with sufficient information to be able to avail themselves of the Double Jeopardy Clause. *See generally Kemp*, 500 F.3d at 280. The fact that the Government's theory of prosecution may be "novel"—as Defendants suggest—does not, without more, render the Indictment defective. *See, e.g., United States v. Manzo*, 712 F.3d 805, 811 (3d Cir. 2013) ("Just because the government lacks 'precedent' does not automatically mean that its position is frivolous. The government should be allowed to base a prosecution on a novel argument, so long as it is a reasonable one . .

. .") (internal citations omitted). Defendants' motion to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) is denied.

An appropriate Order accompanies this Opinion.


Date: February 4, 2015                           s/ Jose L. Linares
                                                 Jose L. Linares
                                                 United States District Judge